| Project | Start Date | Description of Changes in Completion Schedule | Reasons for any Delays | Additional Information |
|---|---|---|---|---|
| *SCI-Rockview* | | | | |
| L-2 Housing Unit | 01/12/2000 | 05/26/2001 | Weather | Project completion date 04/2001. 68% Completion of Construction |
| Kitchen/Dining Room Renovations | 01/12/2000 | 05/26/2001 | Weather | 68% Completion of Construction |
| Perimeter Upgrades | 01/12/2000 | 05/26/2001 | Weather | 68% Completion of Construction |
| *SCI-Graterford* | | | | |
| L-2 Housing Unit | | None | Awaiting Budget Office approval to bid | Completion date 04/2002 |
| Kitchen/Dining Renovations | 12/08/1999 | 04/11/2001 | Weather | 60% Completion of Construction |
| Perimeter Upgrades | Not available | None | No Delay | Architect assigned on 1/8/99. Project is at 95% design completion. |
| *SRCF-Mercer* | | | | |
| L-3 Housing Unit | Not available | None | No Delay | Architect selected for design 06/27/2000 |
| Perimeter Upgrades | Not available | None | No Delay | Architect selected for design 06/27/2000 |
| Support Services | Not available | None | No Delay | Architect selected for design 06/27/2000 |
| Program & Support Building Upgrades | Not available | None | No Delay | Architect selected for design 06/27/2000 |
| *SCI-Greensburg* | | | | |
| L-4 Housing Unit | Not available | None | No Delay | Architect selected for design 06/27/2000 |
| *SCI-Cresson* | | | | |
| L-4 Housing Unit | Not available | None | No Delay | Architect selected for design 06/27/2000 |
| *SCI Laurel Highlands* | | | | |
| L-4 Housing Unit | Not determined yet | | | Project pending approval from PCCD |
| *SCI-Muncy* | | | | |
| L-4 Housing Unit | Not available | None | No Delay | Architect selected for design 11/07/2000 |

## Drug Testing, Sanctioning and Intervention Projects

From June - December 2000, the Canine Expansion project moved forward with interviews and the selection process for four new canine handlers. DOC also purchased four kennels for their new canine partners. The canines were procured from the U.S. Customs Canine Center, the Susquehanna Service Dog program and one canine was donated from a private citizen of the Commonwealth. An 11-week Academy was conducted at Pennsylvania's Quehanna Boot Camp where four handlers and canines were trained to be Drug Detector Dog teams followed by a five week on the job-training program. The total number of teams to be trained for the entire grant period is 26. The next Canine Academy will start in March or early April 2001 and DOC will continue to train 12 more teams by the end of 2001. This also includes time that will be used for the handler selection and canine procurement processes.

APP. 79

**Instructions**

☐   Report (in Item 2A) the number of Part 1 violent first releases in 2000.  If you are unable to report the number
        released, write "DK" in the space provided.

☐   If you are unable to provide the number admitted for Part 1 violent first releases, use the same definition used in
        your previous application.

**Comments:**

**State/Territory:**

3.   Violent prisoners covered under Truth-in-Sentencing Laws

New court commitments,  First releases, 2000

|   |   | 2000 *ADMISSIONS* | *Releases* |
|---|---|---|---|
| A. | Number violent prisoners | 1,867 | 1599 *57.04* |
| B. | Average total maximum sentence length (in months) (Exclude sentences of life or death) | Mn 68.32 152.85 | Mn 141.02 MX |
| C. | Average time served in prison and jail (in months) | | 79.65 7343 |

☐   Is jail time included? (Yes) (No)

☐   Have prisoners with sentences of life or death been excluded?
Yes   No    *FROM Compute average MAX.*
*They are included in admission and are -1071.1*

**Definitions and Coverage**

☐   **Sentenced prisoners**
Report data only for prisoners with a total maximum sentence of more than
1 year.

☐   **New court commitments**
Include persons entering prison directly from court and not from any
unsuccessful period of community supervision.

*APP. 80*

FROM MIS

State/Territory:

2.  **First Releases of Sentenced Violent Prisoners During the Calendar Year**

2000

A.  Number of Part 1 violent
    prisoners released

    or          *1599*

    Number of violent prisoners
    released (using previously
    approved definition)

B.  Average total maximum          *Mil 57.04*
    sentence length (in months)
    (Exclude sentences of life or death)   *141.02*

C.  Average time served in prison      *79.13 79.61*
    and jail (in months) by released
    violent prisoners

    ☐  Is jail time included?  (Yes)  (No)

    ☐  Have prisoners with
       sentences of life or death
       been excluded?   (Yes)   No

Definitions and Coverage

☐  **Sentenced prisoners**
Report data only for prisoners with a total maximum sentence of more than
1 year.

☐  **First Releases**
Report data only for prisoners released for the first time on the current
sentence.  Exclude persons who were previously released for the same
offense, returned to prison and then released again.

☐  **Part 1 violent crimes**
Include murder and non-negligent manslaughter, forcible rape, robbery, and
aggravated assault as reported to the FBI for purposes of the Uniform Crime
Reports.

☐  **Total maximum**
sentence length
Report the total maximum sentence to incarceration including all consecutive
sentences.  Do not assign numeric values to sentences of life or death.

*APP. 51*

State/Territory:

1. New Court Commitments of Sentenced Violent Prisoners During the Calendar Year

2000

A. Number of sentenced persons admitted to prison for Part 1 violent crimes    *1867*

or

B. Total number of sentenced persons admitted for violent crimes

Definitions and Coverage

☐ Sentenced prisoners
Report data only for prisoners with a total maximum sentence of more than 1 year.

☐ New court commitments
Include persons entering prison directly from court and not from any unsuccessful period of community supervision.

☐ Part 1 violent crimes
Include murder and non-negligent manslaughter, forcible rape, robbery, and aggravated assault as reported to the FBI for purposes of the Uniform Crime Reports.

☐ Total violent crimes
Use the definition that was approved for your previous application.

Instructions

☐ Report (in Item 1A) the number of sentenced persons admitted to prison for Part 1 violent crimes in 2000.

☐ If you are unable to provide the number admitted for Part 1 violent crimes, write "DK" in the spaces provided (in Item 1A) and report data for Item 1B.

Comments:

*App. 82*



**PAROLE DECISIONS 1989-2001**

◪ Parole Granted ■ Parole Refused

TOTAL NUMBER CONSIDERED

EXHIBIT K



## Parole Board Statistics 1990-1991

| Violent Offenses | Parole | ReParole | Total | % Total |
|---|---|---|---|---|
| Homicides/Manslaughter | 370 | 91 | 461 | 6 |
| Assault | 586 | 89 | 675 | 8.8 |
| Robbery | 882 | 304 | 1,186 | 15.4 |
| Burglary | 903 | 274 | 1,177 | 15.3 |
| Arson | 75 | 19 | 94 | 1.2 |
| Rape | 224 | 64 | 288 | 3.7 |
| Other Sex Offenses | 159 | 20 | 179 | 2.3 |
| **Sub Totals** | 3199 | 861 | 4060 | 52.7 |
| Non Violent Offenses | | | | |
| Drug Law Violations | 1485 | 97 | 1,582 | 20.5 |
| Theft, RSP | 644 | 153 | 797 | 10.4 |
| Forgery and Fraud | 235 | 46 | 281 | 3.7 |
| Driving Under Influence | 300 | 16 | 316 | 4.1 |
| Other Type Offenses | 580 | 85 | 665 | 8.6 |
| **Sub Totals** | 3244 | 397 | 3641 | 47.3 |

In comparison to 2002 statistics that show only 24% of all yearly parole grants go to nonparole violator violent offenders, parole statistics from 1990-1991 reveal that over 75% of all yearly parole grants went to nonparole violator violent offenders.

EXHIBIT 10

EXH. F

APP- Pg. 54

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PA

RE: MICHAEL MCCOLE v. PA PAROLE BOARD, CASE NO. 04-261 ERIE

AFFIDAVIT OF STEVEN A. HEISER

In my capacity of providing legal assistance to Michael McCole, I notified him of the 6 PA Applications for Grant Money under the Violent Offender Incarceration/Truth-In-Sentencing Incentive Grant program on or about January, 2005.  I was aware that Mr. McCole had filed a federal writ of habeas corpus which I actually prepared and drafted.  Upon receiving VOI-TIS documents from the PA Commission on Crime and Delinquency, I noted that the promises made good on by Pennsylvania may have arisen to a claim of due process and/or ex post facto violation. I asked Mr. McCole if he would like to amend the habeas corpus petition to include a due process issue relative to the Parole Board's par;ticipation in the VOI-TIS application. He agree. I drafted the Motion for Permission to Amend.

I moved to procure the VOI-TIS documents in order to obtain research material for the writing of an article in The Spotlight a periodical that I write and publish concerning the Board of Probation and Parole.  Like many other people including lawyers and judges, I myself was utterly taken aback after reading the statements and actions taken by the Board in order to fullfill VOI-TIS prerequisites.

I can honestly state that Mr. McCole was completely unaware of the facts stated within PA's VOI-TIS applications and that once he was made aware of those facts, he moved to amend his habeas corpus petition well within the one year time frame that is prescribed for filing habeas corpus claims.


I hereby declare under the penalty that the foregoing is true and correct to the best of my knowledge, information, and belief.

Steven Heiser
1600 Walter Mill Road
Somerset, PA  15510

September 9, 2005

App. 85

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

███████████████         )
                        )
        Petitioner,     )
                        )
    vs                  )    CIVIL ACTION NO. 03-375E
                        )
PA. BOARD OF PROBATION & PAROLE,   )
and HARRY WILSON, Superintendent,  )
                        )
        Respondents.    )

DECLARATION OF BENJAMIN A. MARTINEZ

I, Benjamin A. Martinez, hereby state subject to the penalties

of perjury under 28 U.S.C. §1746 that the following facts are true

and correct based upon my personal knowledge or from official

records of the Pennsylvania Board of Probation and Parole,

maintained in the ordinary course of carrying out its obligations

to the citizens of this Commonwealth:

1. I am the Chairman of the Pennsylvania Board of Probation and

Parole (hereinafter "the Board").   I became Acting Chairman on

February 19, 2003, and Chairman on September 30, 2003. I have been

a Member of the Board since June 3, 1998. Starting in May 1984, I

began my employment with the Board starting as a Parole Agent, then

a Parole Supervisor and from August 3, 1996, a Board Hearing

Examiner, a position I held until my appointment as a Board Member.

Prior to working for the Board I worked as a county Probation

Officer for six years.

2. As Chairman, Board Member and employee of the Board for almost

1

*App. Pg. 86*

20 years, I am familiar with the Board's policies and procedures over my entire tenure with the Board.

3. An institutional parole representative (most commonly, an institutional parole agent) completes the first part of a form, styled "Parole Decision Making Guidelines" form (hereafter "internal 'guidelines' form"), before an offender is interviewed by one or more representatives of the Board. The task of completing the internal "guidelines" form, which is actually a parole risk assessment form, and not truly a set of guidelines, is a clerical task and the parole agent is not authorized by the Board to exercise any discretion in completing the form. This has been practice since 1981 when the first internal "guidelines" forms began being used.

4. Thereafter, representatives of the Board, after considering all the factors set out in Section 19 of the Probation and Parole Law, Pa. Stat. Ann. tit. 61, § 331.19 (West 1999) (hereinafter referred to as "§ 19"), in the exercise of their discretion, determine whether the offender is sufficiently rehabilitated to warrant his release on parole, and whether his release would constitute an unreasonable risk to public safety.

5. Although § 1 of the Probation and Parole Law, Pa. Stat. Ann. tit. 61, § 331.1 West 1999) (hereinafter referred to as "§ 1"), was amended in 1996, the Board does not now interpret, nor has it ever interpreted, that amendment to affect its parole decision making

2

AA. 87

authority. Therefore, that amendment of the declaration of public policy did not increase the likelihood that any offender would be refused parole.

6.   The state supreme court's decision in *Winklespecht v. Pennsylvania Bd. of Prob. And Parole*, 813 A.2d 688 (Pa. 2002), decided on December 31, 2002, accepted the Board's argument and confirmed its interpretation that the law had not been changed materially by that amendment. That decision informs all the Board's decisions as of December 31, 2002.   More recently, the state supreme court has had the opportunity to revisit this issue in *Finnegan v. Pennsylvania Board of Probation & Parole*, 838 A.2d 684 (Pa. 2003). The *Finnegan* court reaffirmed its *Winklespecht* decision that the aspirational language added on December 18, 1996, to § 1 does not violate the *Ex Post Facto* Clause.   *Finnegan*, 838 A.2d at 687-690.

7. The Board has not exercised its discretion to parole offenders differently since the 1996 amendment of § 1 than it did before December 18, 1996. Both before and after the 1996 amendment of § 1, the Board would not release an offender when, in the Board's opinion, the interests of the Commonwealth in preventing crime would be injured by the offender's release.

8. The Board does not interpret the amendment of § 1 to change the public policy as to which offenders should be paroled and when they should be paroled, but rather as a legislative emphasis of the

3

*App. 55*

Board's statutory charge to make paroling decisions in accordance with the original intent of § 19 and Pa. Stat. Ann. Tit. 61, § 331.21 (West 1999) (hereinafter referred to as § 21) — whether "the interests of the Commonwealth will be injured" by the release of the offender. It has always been the Board's mandate to protect the safety of the public. Therefore, each of the factors outlined in § 19 and § 21 are considerations that go to assess the same question. The Board interprets the amendment of § 1 as only a reemphasis of the pre-existing consideration of public safety contained in § 21.

9. The Board has implemented no new criteria to be applied in the parole decision-making process because of the 1996 amendment. Only the factors contained in § 19 and § 21 were considered in ▮▮. ▮▮▮▮▮▮▮▮▮▮ case, as they are in all cases.

10. Since the 1943 amendment of § 19 of the Parole Act, the Board has been directed to consider the recommendations of not only the trial judge and the district attorney but also "of each warden or superintendent, as the case may be, who has had charge of the applicant, each of whom is directed to submit to the board his recommendation and the reasons therefore, with respect to each parole application." Parole Act, § 19 (Purdon's 1964).

11. Statistics compiled by the Board show that the rate of parole and reparole decreased each year from 1992 to 1996—before the amendment of § 1 (which was not enacted until December 18, 1996)—but that the rate of parole and reparole has actually been greater

4

APP 89

than the 1996 rate in every year since the amendment was passed.
Indeed, the lowest rate for any quarter occurred during the first
quarter of 1996 (that is, from January 1, 1996, through and
including March 31, 1996) when the rate of parole and reparole was
29%.

| Calendar year | Percent of Paroles and Reparoles Granted |
|---------------|------------------------------------------|
| 1990 | 73.1% |
| 1991 | 78.9% |
| 1992 | 77.4% |
| 1993 | 75.3% |
| 1994 | 68.2% |
| 1995 | 53.3% |
| 1996 | 38.8% |
| 1997 | 41.8% |
| 1998 | 41.7% |
| 1999 | 48.3% |
| 2000 | 49.8% |
| 2001 | 52.5% |
| 2002 | 50.9% |
| 2003 | 58% |

As can be seen from this table, the percentage of offenders paroled
or reparoled did not decrease following the enactment of the
amendment of § 1 on December 18, 1996, but rather increased from
approximately 39% in 1996, to approximately 42% in 1997 and most

5

App. 90

recently, to approximately 58%.

12. In the majority of the seven years since the enactment of the amendment of § 1 of the Probation and Parole Law, the percentage of offenders paroled or reparoled increased every year, falling slightly only in 1998 and again in 2002.

13. Internal "guidelines" forms do not announce any policy of the Board, but rather each revision represents an attempt by Board staff to reflect the Board's paroling rates as they existed during a statistically significant period immediately before that internal "guidelines" form was created.

14. The first internal "guidelines" form was put into use on or after January 9, 1981, the date found on that internal "guidelines" form. Thereafter, the internal "guidelines" form was revised in August of 1983, April of 1988, September of 1990, April of 1998, February of 2003, and most recently in August of 2003. The form was also revised at unspecified times between April of 1998 and February of 2003.

15. The fact the 1998 change in the internal "guidelines" form did not affect the parole rate is shown by the statistics. The rate of favorable parole action increased from almost 42% in 1998, the year the internal "guidelines" form was revised in April, to over 48% in 1999, the first full year after the internal "guidelines" form was revised—an increase of 6.6%.

16. Moreover, the internal "guidelines" forms have never been

6

APP 91

applied inflexibly. Indeed, by virtue of the very nature of any of the internal "guidelines" forms, which do not purport to dictate a decision but rather to reflect the Board's practice, it is impossible to apply them inflexibly. The Board has never been bound to follow any numerical score recommendation

regarding the grant or denial of parole which may appear on an internal "guidelines" form. To the contrary, the Board, whose staff developed the internal "guidelines" forms and their numerical score, is empowered to exercise its discretion in any manner consistent with a proper consideration of the factors set out in § 19 and § 21 of the Probation and Parole Law and, in the exercise of that discretion, is free to disregard any numerical score recommendation contained on any internal "guidelines" form. The Board staff, who are subordinate to the Board itself, are not authorized by statute or

by practice to dictate to the Members of the Board how to exercise their statutory discretion.

17. The Board has never promulgated any regulations regarding an internal "guidelines" form pursuant to the Commonwealth Documents Law or the Regulatory Review Act. In fact, the Board never formally adopted any internal "guidelines" form until February 2003 and more than one version of the form had been in use at the same time before that. The minutes of the Board meeting of February 10, 2003, reflect the following: "Motion was made by Mr. Castor, seconded by

7

AP. 92

Mr. Lucht and carried unanimously, to approve the 'Parole Decision Making Guidelines' as a tool in assisting the exercise of the Board's discretion in the paroling process." Had the Board considered the internal "guidelines" forms as embodying Board policy they would have had to have been adopted at a public meeting as required under the Commonwealth's "Sunshine Act."

18. The substantial flexibility of any of the internal "guidelines" forms has never limited the Board's discretion regarding parole decisions in any way whatsoever. The Board has always had the discretion to grant or deny parole, regardless of any decision recommended by an internal "guidelines" form.

19. Filling in the blanks on the internal "guidelines" form to arrive at a numerical score recommendation is merely the first of many steps in the parole decision-making process. In addition to the internal "guidelines" form recommendation, the Board also considers other factors to the extent applicable, such as:

- the recommendations of the prison warden or superintendent in charge of the institution in which the offender is confined;

- the recommendation(s) of the sentencing judge(s);

- the recommendation(s) of the prosecuting attorney(s);

- victim input (if any);

- prior parole supervision history;

- the statements of the offender during a parole interview;

8

*APP. 93*

- the demeanor of the offender during a parole interview;

- the viability of offender's proposed parole plan;

- any sex offender reports;

- any mental health reports;

- any medical reports that would imply a physical inability to commit further antisocial acts;

- any detainers reflecting unresolved criminal charges, other sentences of confinement, or potential deportation;

- the notes of testimony from the trial(s) and sentencing hearing(s);

- the complete criminal record of the offender;

- the complete nature and circumstances of the offense(s);

- physical history of the offender;

- mental history of the offender;

- behavior history of the offender; and

- the offender's history of family violence.

The majority of these factors are not reflected in any way in the internal "guidelines" form's numerical score.

20. Beginning with my appointment as a Hearing Examiner on August 3, 1996, I have interviewed offenders for parole and voted on whether to parole them - both before and after the December 18, 1996, amendment of § 1 of the Probation and Parole Law.

21. The criteria used by the Board in exercising its discretion to parole offenders has not changed at any time since my appointment

9

A/P · 94

as a Board Hearing Examiner.

22. Probably the most important factor that affected parole rates during the mid-1990's, was the change in the membership of the Board. The terms of Board Members Dahle Bingaman, Raymond McGinnis and Mary Ann Stewart expired July 9, 1994, May 12, 1995, and May 12, 1995, respectively, and the Governor did not reappoint them. Beginning July 9, 1994, one of the five Board Member positions was vacant as a result of the expiration of the term of Dahle Bingaman. On May 12, 1995, a total of three of the five Board Member positions were vacant when the terms of Raymond McGinnis and Mary Ann Stewart expired. On May 23, 1995, the number of Board vacancies was reduced to two when Michael Webster was appointed and on June 19, 1995, the Board was up to its then full complement when Nicholas Muller and Sean Ryan were appointed. On December 18, 1996, Section 2 of the Probation and Parole Law, Pa. Stat. Ann. tit. 61, § 331.2 (West 1999) was amended to increase the number of Board Members from 5 to 9. Since December 18, 1996, William F. Ward (February 10, 1997), Richard Kipp (June 10, 1997), Barbara Descher (June 10, 1997), Gary R. Lucht (June 14, 1999), Lloyd White (June 6, 2001), Jeffrey R. Imboden (October 28, 2003), Michael L. Green (October 28, 2003), Gerard N. Massaro, Ph.D., (February 10, 2004) and I (June 3, 1998) were appointed to six year terms as Board Members, effective the dates provided. The differences in the exercise of discretion by Board members reflect the differences in

10

APP. 95

their viewpoints and approaches and are not the result of any change in the Board's parole criteria, standards or policy.

23. At all times that I have been a Parole Agent, a Parole Supervisor, a Hearing Examiner, a Board Member or the Board Chairman, the criteria, standards and policy used by the Board Members to exercise their discretion whether to parole offenders have been embodied in § 19 and § 21—that is, the Board has not released an offender when, in the Board Members' opinion, the interests of the Commonwealth in preventing crime would be injured by the prisoner's release. The Board has not changed its parole criteria, standards or policy at any time during this period. No recommendation of any Senate Committee, assessment or decision of the Pennsylvania Inspector General or report by the Chairman of the Senate Judiciary caused a change in the Board's parole criteria, standards and policy.

24. The official records of the Board reflect that ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ is presently serving an aggregated sentence of not less than 9 years and 9 months nor more than 25 years for the crimes of involuntary deviate sexual intercourse, statutory rape, endangering the welfare of children (3 counts) and indecent assault. Judge ▇▇▇▇▇▇ of the Court of Common Pleas of ▇▇▇▇▇ County imposed this sentence on September 3, 1998, with an effective date of September 29, 1990. The Department of Corrections has calculated a minimum term

11

App. 96

expiration date of June 30, 2000, and a maximum term expiration date of September 29, 2015.

    25.   The Board has denied ████████ parole on five occasions—all before he filed his petition in this Court: April 3, 2000, March 6, 2001, August 5, 2002, January 15, 2003, and October 22, 2003 (the last three times the internal "guidelines" form recommendation was "likely to parole"). Therefore, the last two times the Board considered ████████ for parole was after the Pennsylvania Supreme Court's decision in *Winklespecht*.

Executed this _3_ day of ___MAY___, 2004

_____
Benjamin A. Martinez
Chairman, Pennsylvania Board of Probation and Parole

12

App 97



# Governor's Office

### PROCLAMATION

By virtue of the authority vested in me by Article II, Section 4; Article IV, Section 12; and Article III, Section 12; of the Constitution, I, Thomas J. Ridge, Governor of the Commonwealth of Pennsylvania, do hereby convene the General Assembly in special and extraordinary session, to meet in the Capitol, at Harrisburg, on Monday, January 23, 1995, at 1:00 P.M., to consider legislation, including relevant appropriations, upon the following subjects:

1. An orderly process to implement the death penalty.

2. Reduction of juvenile crime by reforming the system and laws relating to crimes committed by juveniles.

3. Enhancement of the ability of law enforcement officials and the judiciary to identify, prosecute, punish and monitor sex offenders and child molesters.

4. Reform of the pardons and commutations system and laws to ensure the public safety.

5. Improvement of public safety by denying bail to dangerous prisoners; by imprisoning dangerous offenders for longer prison terms; by increasing available prison space in which to incarcerate offenders; by limiting judicial remedies in prison conditions litigation; and by limiting access to firearms by minors and others likely to misuse them.

6. Revision of the "Wiretapping and Electronic Surveillance Control Act."

7. Improvement of the delivery and scope of services and restitution to crime victims.

8. Authorization of the Department of Corrections to implement inmate work programs.

9. Elimination of substance abuse by convicted state offenders and of contraband within state correctional facilities.

10. Improvement of coordination and cooperation among law enforcement and criminal justice agencies.

11. Reduction of violence in schools and communities through school-based and community-based crime prevention.



GIVEN under my hand and the Great Seal of the State, at the City of Harrisburg, this eighteenth day of January, in the year of our Lord one thousand nine hundred and ninety-five, and of the Commonwealth the two hundred and nineteenth.


THOMAS J. RIDGE
Governor



APP. 98

9/15/05

Michael Mc Cole  AS-0521 CC-28
1111 Altamont Blvd.
Frackville, PA 17931-2699

The Honorable Judge Susan Paradise Baxter
US District Court for the Western District of PA
17 South Park Row
Room A 280
Erie, PA  16501

Dear Judge Baxter:
    First let me, as always, wish you optimum health, the utmost happiness, and continued success in all of your endeavors.
    Enclosed please find my  "TRAVERSE TO RESPONDENT"S ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS".  This "TRAVERSE" is filed timely per the extension granted by the Court to file  this "Traverse"  on or by September, 15, 2005.
    Also enclosed with this petition is my cashslip signed and dated 9/15/05.  Therefore, according to the mailbox rule this petition is timely filed according to **Comm. v. Thomas, 814 A. 2d 754.**   The mailbox rule states that any mailings by a state prisoner is considered filed when it is placed in the prison mailing syatem.  Therefore, the enclosed cashslip enclosed with the petition is proof that the "Traverse was filed timely.
    I would like to thank the Court for the patience and consideration it has shown me by granting the extension to file this petition.

Respectfully Submitted,

Michael Mc Cole pro se

| DC-138A<br><br>**CASH<br>SLIP** | COMMONWEALTH OF PENNSYLVANIA<br>DEPARTMENT OF CORRECTIONS |
|---|---|

| 1.  REQUISITIONING INMATE | _Mc Cole_ | |
|---|---|---|
| FACILITY NUMBER<br>_AS-0521_ | LOCATION<br>_CC-28_ | DATE<br>_9/15/05_ |

**2.  ITEMS TO BE CHARGED TO MY ACCOUNT**

_deduct for postage to:_

~~[redacted]~~

_US. District Court_
_WESTERN PA_
_JUDGE BAXTER_
_17 S. PARE ROW_
_Room A288_
_ERIE, PA 16501_

_TRAVERSE TO RESPONDENTS ANSWER TO_
_PETITION FOR WRIT OF HABEAS CORPUS_

| 3. INMATE'S SIGNATURE<br>_JmF McCole_ | 4. OFFICIAL APPROVAL |
|---|---|

**5.  BUSINESS OFFICE'S SPACE**

| CHARGE ENTERED<br>$ | DATE | BOOKKEEPER |
|---|---|---|