IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**Michael McCole,**
    *Petitioner,*

    vs.

**Pennsylvania Board of
Probation & Parole,**
    *Respondent.*

Docket # _04 - 261 E_

(Mag. Jud. S.P. Baxter)

## POST ANSWER SUBMSSION TO ADDRESS RECENT <br> <u>THIRD CIRCUIT COURT OF APPEAL'S DECISION</u>

    *AND NOW COMES,* pro-se litigant, Michael McCole who respectfully

avers the following.

    1. Per Order, the Court has granted permission for Petitioner to file this

submission due to the Third Circuit Court of Appeal's recent

decision in *Richardson v. Pennsylvania Bd. of Probation and Parole,* 423

F.3d 282 (3rd. Cir. 2005) which set forth a clarified two prong standard

relative to *ex post facto* claims like the one currently before the Court's

consideration. *Richardson* also resolved the dispute as to what, if any,

dispositive value *Winklespecht* (cite omitted) may have in *ex post facto*

claims involving parole reviews that post-date *Winklespecht.* Petitioner

addresses these concerns below.

2.     *Richardson* held that  to be eligible for habeas corpus relief based on a violation of the Ex Post Facto Clause, a petitioner must satisfy the  *ex post facto* inquiry which has two prongs: (1) whether there was a change in the law or policy which has been given retrospective effect, and (2) whether the offender was disadvantaged by the change.

3.   As to the second prong,  *Richardson* instructed that a petitioner seeking habeas relief, on grounds that the 1996 amendments to the Pennsylvania Parole Act as applied to his parole applications violated the *ex post facto* clause, must provide the requisite evidence ( "*some evidence*" *1/)* that he faces a significant risk of an increase in punishment, by showing that *under the pre-1996 Parole Act, the Pennsylvania Parole Board would likely have paroled the prisoner.*

4.     *Richardson*  provides a few examples how a prisoner might meet his burden to show "some evidence": a petitioner might compare the parole rates for prisoners with similar convictions before and after the 1996 Amendments, state whether the Parole Guidelines would indicate that the

---

1/  The Court noted that:
                    "Mickens-Thomas may be an exceptional case because of the compelling nature of the evidence of prejudice.  We do not require a petitioner to muster evidence of such convincing quality, particularly in the absence of an evidentiary hearing.  Nevertheless, our precedents require that a petitioner proffer at least some evidence of disadvantage to warrant habeas relief."

petitioner was a good parole candidate, or draw inferences from the statement of reasons provided by the Parole Board regarding the criteria used for the parole determination in that individual's case.

5. Petitioner is able to meet both prongs of the *Richardson ex post facto* inquiry. As to the first prong (*whether there was a change in the law or policy which has been given retrospective effect*) the facts of the case *sub judice* are nearly indistinguishable from those in *Richardson.*

6. Attached to Petitioner McCole's habeas corpus petition are Exhibits 5 and 9. The exhibits are copies of the official written Board Notifications notifying Petitioner that the two subject parole bids had been denied.

7. Exhibit 5 reveals that Petitioner's 2002 parole bid was denied because: "*fair administration of justice cannot be achieved thorugh release on parole*". *Richardson* found that the term, "*fair administration of justice*" "mirrored the language of the 1996 Amendments *2/* (noting, "the

---

2/ The Court was correct. Purdon's Title 61 Section 331.1 (the actual 1996 Parole Act Amendment) reads:

"In providing these benefits to the criminal justice system, the board shall first and foremost seek to protect the safety of the public. In addition to this goal, the board shall address input by crime victims and *assist in the fair administration of justice* by ensuring the custody, control and treatment of paroled offenders." (emphasis added)

3

denial took out the public safety language but stated that "the fair administration of justice cannot be achieved through your release on parole.").

8.    Likewise, Petitioner's 2003 parole denial was based on the Parole Board "...having considered all matters required pursuant to the Parole Act of 1941, *as amended, 61 P.S. Section 331.1...*" Habeas Corpus Exhibit 9. Again, *Richardson* found that this same written Board Notice sufficiently demonstrated that the Board did rely on the amended Parole Act in making its determination ("the parole decision specified that its denial was based on a consideration of 'all matters required pursuant to the Parole Act of 1941, as amended,  61 P.S. § 331.1 et seq.'".). *3/*

9.    Although Petitioner is able to meet the first prong of the *ex post facto* inquiry, *Richardson* instructed that  "it is not sufficient for a prisoner to show that the Board relied on a new law or policy.  Rather, he must also adduce some evidence that this new law or policy disadvantaged him by creating "a significant risk of increasing his punishment." Garner, 529 U.S. at 255."

---

3/  In an analogous case on appeal to the Third Circuit Court of Appeals, *Bornheimer v. PBPP*, No. 05-1204 (Appellant & Appellee Brief filed, 2005), Respondent's attorney conceded that the same written notification was "found insufficient in *Richardson*."

10.  While Petitioner contends that he is able to meet the second prong

of the *Richardson ex post facto* inquiry, as discussed more fully below, a

concommittant matter involving the State Supreme Court's decision in

*Winklespecht v. PBPP*, 571 Pa. 685, 813 A.2d 688 (Pa.2002) and its impact

on the first prong requires discussion.

11.  As in *Richardson* and in the case *sub judice*, Respondents argue that

> "after *Winklespecht*, it was clear that the 1996 Amendments did not establish a new law or policy.  Without a change in law or policy, the Commonwealth claims that the first prong of the ex post facto inquiry is not satisfied.  Thus, the Commonwealth asserts that the applicability of *Mickens-Thomas* is limited to those parole decisions made under the Parole Board's pre-*Winklespecht* understanding of the 1996 Amendments."

12.  This is because, as Respondent reasons, *Winklespecht* , decided

after *Mickens-Thomas*, determined that the 1996 Amendment did not in

fact change the substantive criteria for parole.

13.  Richardson rejected this argument and held that Respondent's

interpretation of *Winklespecht* was "undermined" by the State Supreme

Court's "about-face" in  *Cimaszewski v. Board of Probation and Parole*,

868  A.2d 416, 426-27 (Pa.2005) which held that "retroactive changes in

5

the law governing parole may violate the *ex post facto* clause."

14.  The *Richardson* Court determiend that *Cimaszewski* dispelled any suggestion that *Winklespecht* had interpreted the 1996 amendments as making no substantive change in the criteria for parole.

15.  Given *Cimaszewski, Richardson* held, *Mickens-Thomas* appears to have retained vitality.  And now, *see* Footnote 3, *supra*, Respondent appears to have abandoned any contrary argument. *4/*

16.  Petitioner now turns to the available evidence that would satisfy *Richardson*'s direction that "*some evidence*" be adduced to demonstrate that under the pre-1996 Parole Act Respondents "would likely have paroled the prisoner."

17.  Petitioner's proffers the following summary of evidence:

**A.** *The Parole Guidelines show that Petitioner is a fair candidate for parole. 5/* Petitioner's age, prior convictions and underlying crime places him in the medium risk range. The Board has not stated any countervailing guideline factors in denying Petitioner parole.  The quality and quantity of

---

*4/  Richardson* concluded: "Given this conclusion in *Cimaszewski,* and informed by our own precedent in *Mickens-Thomas*, we hold that the first prong of the *ex post facto* inquiry is satisfied."

*5/*  Specified in  *Richardson.*

6

Petitioner's educational, therapeutic and vocational accomplishments balance in favor of countervailing a parole policy guideline decision not to parole (if in fact the guidelines suggest that result).

B. Petitioner received a recommendation for Parole from the DOC (*see* Habeas Corpus Petition at paragraph 18).

C. Petitioner is convicted of crimes that have low recidivism rate statistics (3.5%) (*see* Bureau of Justice's Recidivism of Sex Offenders - 1994 (Exhibit A attached hereto)).

D. Petitioner has successfully completed the DOC's most intensive sex offender programming (Habeas Corpus Petition at Paragraph 15). This programming was mandated by Respondent and inmates successfully completing such programming were likely to make parole.[6]

E. Petitioner was assessed not to be a sexual predator (Habeas Corpus Petition Paragraph 24). This assessment was requested by Respondent (*See*, 2nd Page of Habeas Corpus Exhibit 5).

F. Petitioner complied with other Board considerations, i.e, good conduct and completion of DOC prescriptive programming (Habeas Corpus Petition at Paragraph 18; Habeas Corpus Exhibits 3 and 4).

---

[6] *Evans v. PBPP*, 820 A.2d 904 (PA Cmwlth. 2003)("To encourage offenders to avail themselves of the opportunity for treatment, early release through parole is used as an incentive".).

**G.** Petitioner's education, vocational and therapeutic accomplishments while in prison are exceptional (Habeas Corpus Petition Paragraph 15; Habeas Corpus Exhibit 2). *7/* Petitioner's achievements suggest that he engaged in academic opportunities: KET/GED Program, Business Math, algebra, Physical Sceience, Human Biology, computer Courses and typing (Habeas Corpus Exhibit 2, paragraphs 1 -- 7) and then sought to help fellow inmates: Certified Laubach Literacy Tutor, Certificate of Recognition (150 hours of teaching), a Literacy Tutor Certificate for helping an illiterate inmate reach an 8th grade writing level, 6th grade level reader and 11th grade math level and Literacy Council Recognition for teaching three students during the day (Habeas Corpus Exhibit 2, paragraphs 9-10, 13, 17-18). Petitioner continued with higher academic pursuits *8/* Petitioner's performance ont he job (library, 1999-2002) grew

---

7/ The 3rd Circuit noted in *Mickens-Thomas v. Vaughn* (*Michens-Thomas I*) that prior to 1996, the PBPP's internal policies requried it to weigh the inmate's rehabilitation and liberty interest with the interest of public safety in parole evaluations. The Court went on to note that "the PBPP's Manual of Operations and Procedures recognized that 'probation and parole services must consider that offenders can change their behavior patterns when desirous, capable, and given the opportunity, help, dignity, and respect they deserve as human beings.'" Given the extensive nature and quality of Petitioner's accomplishment, under the pre-1996 Parole Act, these would have weighed in favor of likely paroling.

8/ Luzerne Community college (tuition self-paid), President's List for acquiring 4.0 grade average, DOS DStutor Computer Calss, MSworks/Quatro computer class, Microsoft office 2000 (Habeas Corpus Exhibit 2, paragaphs 20-22) and various vocational programs: Refrigeration Vo-Tech, Basic then Advanced Stain Glass, Advanced lead Glass Auto Body Report, Automotive Service Excellence (ASE) certificate for Painting and Refinishing, ASE Certification for Non-Structural damage and repair and various certificates for ongoing achievements in these areas (Habeas Corpus Exhibit 2, paragraphs 23, 29-30, 32, 41-47, 52-54).

from very good to excellent work (Habeas Corpus Multiple Exhibit 4).

Along with the above, Petitioner has completed a sundry of personal

growth programs dealing with stress and anger, substance abuse and

sexual abuse (Habeas Corpus Exhibit 2, paragraphs 14, 25-27, 34, 36-37,

39-40).

H.  A comparison of parole rates for prisoners with similar or even

worse convictions show a substantial better parole rate under the pre-1996

paroling standards. 5/ (Habeas Corpus Petition, paragraphs 46, 58-59;

Habeas Corpus Exhibits 10, 18 and 21). *See also* footnote 9 below:

convicts with similar or worse offenses were generally paroled on

minimum.

I.  An accompanying affidavit regarding pre and post-paroling

practices and other relevant matters support the conlcusion that Petitioner

would likely have been paroled under the pre-1996 Parole Act (Exhibit B

attached hereto).

---

9/ *Brandy v. PBPP*, 530 A.2d 507 (Pa.Cmwlth. 1987)(2nd degree murder, robbery, 10
to 20; paroled on minimum); *Brandley v. PBPP*, 587 A.2d 839 (Pa.Cmwlth. 1991)(3rd
degree murder; paroled on minimum); *Shaw v. PBPP*, 668 A.2d 590 (Pa.Cmwlth. 1995)
(paroled in 1993 on minimum for 3rd degree murder); *Lord v. PBPP*, 580 A.2d 463
(Pa.Cmwlth. 1990)(9 to 21 years for rape, ISDI, escape; paroled on minimum); *Brown
v. PBPP*, 668 A.2d 218 (Pa.Cmwlth. 1995)(burglar paroled on minimum).

J.  *Inferences drawn from Respondent's statement of criteria used to make its parole decision* (Addressed in Habeas Corpus Petition, paragraph 43) 5/ Petitioner's 2002 parole denial directed a one-year set-back until the next review; the 2003 parole denial directed a five-year set-back until the next review and relied heavily on "predatory nature of offenses" and "high risk" to offend both of which were not mentioned in the 2002 parole denial. This phemonemon was ruled dubious in *Bowling v. PBPP*, 01-1400 (U.S. District Court Western District Judge McVerry, Magist. Caiazza, 2003) wherein the court wrote:  "Any statement demonstrating this concern was notably absent in previous reviews."  Moreover, no references to pre-1996 standards were cited in Petitioner's Board Decision Notification Sheet, found untrustworth by the Court in  Bonsall v. Gillis.372 F.Supp.2d 805 (M.D.Pa. 2005) wherein Judge Rambo wrote:

"Although the March 19, 2001 and August 9, 2002 decisions do not specify the safety of the public as a basis for denial, these decisions are devoid of any specific reference to the pre-1996 standards, and there is no mention of seriousness of the offense, length of the sentence, institutional adjustment, personality characteristics, or any of the other pre-1996 factors.  Mickens-Thomas, 321 F.3d at 378."

Noteworthy is, nothing transpired between the 2002 and 2003 parole reviews that would explain the 2003 five-year set-back: the record shows

10

Petitioner continued in Auto Body Repair, was Student of the Month for

autobody class (Habeas Corpus Exhibit 2, paragraphs 43, 45), earned

additional ASE certification in autobody school (Habeas Corpus Exhibit 2,

paragraph 47) continued Sex Offender Program After Care with monthly

meetings with psychologist Ms. Bunner; maintained excellent

score for work on job (Habeas Corpus Exhibit 4) and merited  a second

Student of the Month recognizion for month of January 2003 (Exhibit 2,

paragraphs 54).

   Respondent's only stated concerns as shown on Habeas Corpus

Exhibit 5 and 9 are: favorable recommendation for parole, clear

conduct record, completion the DOC prescriptive programs, sex offender

assessment board evaluation all of which petitioner had satisfied by the

2002 parole review.

   Under Pre-1996 standards parole on minimum was presumed unless

outweighed by a preponderance that the public safety interests of the

community outweigh the liberty interests of the inmate. 1990 Parole

Decision Making Guidelines: A Statement of Policy, Procedure and

Philosophy. *See also*, 1989 Manual of Operations ( elaborated on in

*Mickens-Thomas I)* wherein the Board wrote "that an individual should be

given every consideration for parole at the expiration of the minimum

sentence." Since these factors were not alluded to for the parole denial, it

stands likely that under the pre-1996 Parole Act, Petitioner would have

been granted parole. *10/*

18.  A fair reading of the totality of the evidentiary facts would support
the

conclusion that there is "some evidence" that Petitioner would have likely

been granted parole under the 1996 Parole Act. An evidentiary hearing

may be warranted. *11/*

19.  Petitioner's request for habeas relief includes an order directing

Respondent to release him onto parole which was  the relief granted in

*Mickens-Thomas II.*

---

10/  *Evans v. PBPP*, 820 A.2d 904 (Pa.Cmwlth. 2003) ("Indeed, it appears that the
PBPP's list of considerations is a sham, and the real reason the PBPP enied Evans
parole is that he is a sex offender." Like in Petitioner's case, "Where Evans satisified
every consideration for parole in 2001 and was not a threat to pbulic safety, the PBPP's
denial of parole in 2001 was an arbitrary decision..."). *see also: Mickens-Thomas v.
Vaughn*, 355 F.3d 294, 309-310 (3rd. Cir. 2004)(*Mickens-Thomas II*)(Respondent
engaged in  activities designed to obscure ex post facto violations).

11/  Petitioner's habeas corpus petition has proferred significant evidence that he has
endured increased punishment due to Respondent's reliance on the precepts announed
in the 1996 Parole Amendment. Accordingly, this Court may, *sua sponte*, order an
Evidentiary Hearing with Appointment of Cousnel. *See Townsend v. Sain*, 372 U.S.
293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Procunier v. Atchley*, 400 U.S. 446, 452,
91 S.Ct. 485, 27 L.Ed.2d 524 (1971); *see also*, 28 U.S.C. Section 2254(e)(2).

20.  Respondent's open contempt of the *Mickens-Thomas I* ruling

continues. In *Adams v. Kelchner*, 3:04 cv-799 (Middle District Court of PA,

Judge Conaboy, Magistrate Blewitt), Judge Conaboy ruled that

Respondent was still applying the post-1996 Amendment to pre-1996

cases. More astoundingly, Judge Conaboy noted that three other Reports

and Recommendation were being prepared by U.S. Magistrates in that

District to the effect that habeas relief should be granted predicated on

Respondent's improper application of the 1996 Parole Act Amendment.

21.    Other cases also suggest improper application: *Furman v.*

*Wilson, et al.,* No. 03-379 Erie (Magistrate Judge Baxter) and *Bornheimer*

*v. PBPP*, No. 03-cv 375 Erie (Magistrate Judge Baxter).

22.  In *Edwards v. PBPP*, CA 04-41J (U.S. District Court for the Western

District of PA,  Judge Gibson) the Board's only reason denying Edwards

parole was "public safety".

23.  In yet another 2005 case, *Walls v. PBPP*, No. 413 M.d. 2005 (PA

Cmwlth. 2005), Walls, a pre-1996 violent offender had a parole policy

reocmmendation for parole but was denied for the singular reason:

"criminal history" which is a factor already subsumed in the Parole

13

Decision Making Guidelines. Not one admonition nor direction from

*Mickens-Thomas* I nor II was followed.

24. The cases show that in every year since the *Mickens-Thomas* I

decision was made, Repondent has lightheartedly ignored *Mickens-*

Thomas I. There is nothing to suggest that Respondent will ever provide

the fair, pre-1996 parole review to applicable parole candidates.

Respondents obviously believe their statutory mandate to first and
foremost

protect the public safety overides constitutional guarantees especially

when there is no deterrence to abide by the federal rulings.

25. In *Mickens-Thomas II,* Respondent argued that it enjoyed absolute

paroling authority which is obviously not a correct statement of current
legal

realities..

26. Already, Respondent has sought to conceal the use of the

outlawed, 331.1 in inapplicable cases by removing any references from the

statute from its customary useage in written Board Notifications
announcing

parole denials/grants.

14

27.   The Board also claims there are no statitstic showing violent offender releases since its 1990-1991 Biennial Report (*see* affidavit attached hereto at Exhibit B) *but see*, VOI-TIS documents attached to Petitioner's Amended Habeas Corpus Petition which demonstrates the Board was in fact supplying these statistics to the author of the VOI-TIS applications from 1996 through 2001.

28.   There is ample evidence to grant Petitioner's habeas corpus petition and order, *inter alia,* that the Board should release Petitioner McCole onto Parole.

*Wherefore,* for all of the forgoing reasons, Petitioner prays that the Court grant habeas corpus relief.

Respectfully submitted,

X Michael McCole

Michael McCole

**U.S. Department of Justice**
Office of Justice Programs



## Bureau of Justice Statistics

# Recidivism of Sex Offenders Released from Prison in 1994

Offender characteristics

Sentences and criminal records

Comparisons to other offenders

Rearrests and reconvictions

Rearrest for sex crimes against children

**Exhibit A**

• **Introduction and highlights**

## Introduction

In 1994, prisons in 15 States released 9,691 male sex offenders. The 9,691 men are two-thirds of all the male sex offenders released from State prisons in the United States in 1994. This report summarizes findings from a survey that tracked the 9,691 for 3 full years after their release. The report documents their "recidivism," as measured by rates of rearrest, reconviction, and reimprisonment during the 3-year followup period.

This report gives recidivism rates for the 9,691 combined total. It also separates the 9,691 into four overlapping categories and gives recidivism rates for each category:

- 3,115 released rapists
- 6,576 released sexual assaulters
- 4,295 released child molesters
- 443 released statutory rapists

The 9,691 sex offenders were released from State prisons in these 15 States: Arizona, Maryland, North Carolina, California, Michigan, Ohio, Delaware, Minnesota, Oregon, Florida, New Jersey, Texas, Illinois, New York, and Virginia.

## Highlights

The 15 States in the study released 272,111 prisoners altogether in 1994. Among the 272,111 were 9,691 men whose crime was a sex offense (3.6% of releases).

On average the 9,691 sex offenders served 3½ years of their 8-year sentence (45% of the prison sentence) before being released in 1994.

*Rearrest for a new sex crime*

Compared to non-sex offenders released from State prisons, released sex offenders were 4 times more likely to be rearrested for a sex crime. Within the first 3 years following their release from prison in 1994, 5.3% (517 of the 9,691) of released sex offenders were rearrested for a sex crime. The rate for the 262,420 released non-sex offenders was lower, 1.3% (3,328 in 262,420).

The first 12 months following their release from a State prison was the period when 40% of sex crimes were allegedly committed by the released sex offenders.

Recidivism studies typically find that, the older the prisoner when released, the lower the rate of recidivism. Results reported here on released sex offenders did not follow the familiar pattern. While the lowest rate of rearrest for a sex crime (3.3%) did belong to the oldest sex offenders (those age 45 or older), other comparisons between older and younger prisoners did not consistently show older prisoners' having the lower rearrest rate.

The study compared recidivism rates among prisoners who served different lengths of time before being released from prison in 1994. No clear association was found between how long they were in prison and their recidivism rate.

Before being released from prison in 1994, most of the sex offenders had been arrested several times for different types of crimes. The more prior arrests they had, the greater their likelihood of being rearrested for another sex crime after leaving prison. Released sex offenders with 1 prior arrest (the arrest for the sex crime for which they were imprisoned) had the lowest rearrest rate for a sex crime, about 3%; those with 2 or 3 prior arrests for some type of crime, 4%; 4 to 6 prior arrests, 6%; 7 to 10 prior arrests, 7%; and 11 to 15 prior arrests, 8%.

*Rearrest for a sex crime against a child*

The 9,691 released sex offenders included 4,295 men who were in prison for child molesting.

Of the children these 4,295 men were imprisoned for molesting, 60% were age 13 or younger.

Half of the 4,295 child molesters were 20 or more years older than the child they were imprisoned for molesting.

On average, the 4,295 child molesters were released after serving about 3 years of their 7-year sentence (43% of the prison sentence).

Compared to the 9,691 sex offenders and to the 262,420 non-sex offenders, released child molesters were more likely to be rearrested for child molesting. Within the first 3 years following release from prison in 1994, 3.3% (141 of 4,295) of released child molesters were rearrested for another sex crime against a child. The rate for all 9,691 sex offenders (a category that includes the 4,295 child molesters) was 2.2% (209 of 9,691). The rate for all 262,420 non-sex offenders was less than half of 1% (1,042 of the 262,420).

Of the approximately 141 children allegedly molested by the child molesters after their release from prison in 1994, 79% were age 13 or younger.

# Exhibit A

Released child molesters with more than 1 prior arrest for child molesting were more likely to be rearrested for child molesting (7.3%) than released child molesters with no more than 1 such prior arrest (2.4%).

*Rearrest for any type of crime*

Compared to non-sex offenders released from State prison, sex offenders had a lower overall rearrest rate. When rearrests for any type of crime (not just sex crimes) were counted, the study found that 43% (4,163 of 9,691) of the 9,691 released sex offenders were rearrested. The overall rearrest rate for the 262,420 released non-sex offenders was higher, 68% (179,391 of 262,420).

The rearrest offense was a felony for about 75% of the 4,163 rearrested sex offenders. By comparison, 84% of the 179,391 rearrested non-sex offenders were charged by police with a felony.

*Reconviction for a new sex crime*

Of the 9,691 released sex offenders, 3.5% (339 of the 9,691) were reconvicted for a sex crime within the 3-year followup period.

*Reconviction for any type of crime*

Of the 9,691 released sex offenders, 24% (2,326 of the 9,691) were reconvicted for a new offense. The reconviction offense included all types of crimes.

*Returned to prison for any reason*

Within 3 years following their release, 38.6% (3,741) of the 9,691 released sex offenders were returned to prison. They were returned either because they received another prison sentence for a new crime, or because of a technical violation of their parole, such as failing a drug test, missing an appointment with their parole officer, or being arrested for another crime.

# Exhibit B

*Exhibit B*

### *AFFIDAVIT OF STEVEN HEISER*

Re: <u>McCole v. PBPP</u>, Civil Action No. 04-261E (Mag.Jud. SPB)

The undersigned affiant hereby avers: In my considered opinion, Mr. McCole would likely have been granted parole under the pre-1996 Parole Act, its standards, philosophies and practices.

<u>Foundation of the Opinion:</u> A working familiarity with the Parole Board's pre-1996 Parole Decision Making Guidelines (having studied them extensively and applied them to several cases pending disposition). Knowledge of Parole Board's pre-1996 "Section 19" factors as set forth in Purdon's Title 61 Section 331.19. Above average knowledge of Parole Board's pre-1996 paroling standards, philosophies and practices. Thorough reading of Parole Board's Biennial Reports from 1990 to present (including all current monthly reports)(procured through Right-To-Know Law Petitions). In the capacity of a paralegal, I have researched, drafted and helped litigate various actions involving the Parole Board's retroactive unconstitutional use of post-1996 paroling standards: <u>Furman v. Wilson, et al.</u>, No. 03-379 Erie (habeas corpus action) (Magistrate Judge Baxter); <u>Bornheimer v. PBPP</u>, No. 03-cv375 Erie (Magistrate Judge Baxter); <u>Bornheimer v. PBPP</u>, No. 05-1204 (3rd Circuit Court of Appeals)(certificate of appealability granted); <u>Furman v. Martinez, et al.</u>, No. 3 cv 03-1807 (1983 civil rights action)(Judge Caputo, USDC MD PA 2003); <u>Edmund Thornton v. PA Board of Probation and Parole, et al.</u>, (PA Commonwealth Court, 2004); <u>Bracco v. PBPP</u>, No. 621 M.D. 2003 (PA Commonwealth Court, 2003); <u>McCole v. PBPP</u>, Civil Action No. 04-261E (Mag.Jud. Baxter); <u>Walls v. PBPP</u>, No. 413 MD 2005 (PA Commonwealth Court 2005)(drafted Amendment to Mandamus Petition to meet new standards announced in <u>Richardson</u> (3rd Cir. Court of Appeals). As to the above cases, I have handled the various appeals when necessary to the State Supreme Court and the Third Ciruit Court of Appeals. In general matters, I have been helping fellow inmates with parole board problems since 1980 to the present (letters, homeplans/jobplans, time-computation, administrative appeals, information and so forth (I've been in prison since 1979)). In the capacity of editor, writer and publisher I have since February, 2003, put out a monthly 8 to 10 page publication (circulation, 70) entitled: "The Spotlight: PA Board of Probation & Parole" (currently on a quarterly + basis with circulation, 40) which discusses (in both positive and negative ways) various policies, practices and events involving the state Parole Board. As a writer I have also researched and written many short, 300 -- 500 word articles on the state Parole Board for a monthly publication entitled "Graterfriends" managed and sustained via the PA Prison Society. Although this is the first opinion of its kind that I have endeavored to make, I have written other

# Exhibit B

*Affidavit - Page Two*

affidavits regarding Pennsylvania's participation in the Federal Department of Justice's Violent Offender Inarceration-Truth-In-Sentencing incentive grant program from 1996 through 2001 and its impact on subsequent paroling policies and pratices. And of course, I have intimate knowledge of Mr. McCole's life, criminal history, parole history and other aspects of his prison life over the last 20 years. I am available and willing to provide testimony regarding the various subjects of this Affidavit.

Initially, I note that I would not be able to opine that even under the Pre-1996 Parole Act (also meaning its standards, philosophies and practices) Mr. McCole would axiomatically have been granted parole. Parole grants at least from 1989 to 1996 were never at 100%. The available statistics show that like current statistics, a number of inmates were denied parole each month and there were absolutely no guarantees that any particular inmate would be granted parole, either violent or non-violent offender or technical or convicted parole violator. From 1987 to 1989 an average 7.2 applicants out of 10 were granted parole at the expiration of their minimum sentence. Yearly parole rates ranged from 68% to 70%. During these same years 58% of those denied parole at the expiration of the minimum sentence were granted parole at the very next review. Incidentially, during these years slightly more overall yearly parole grants went to violent offenders (52.7 versus 47.3). This practice was in keeping with the Board's then-philosophy that the potential parole applicant was a "client", amenable to rehabilitation "when desirous" and should be given every "consideration for parole at the expiration of the minimum sentence." (1989 Manual of Operations and Procedures). After the rioting at SCI-CampHill in the early 1990s, 79% of those reaching their minimum were granted parole and 69% of those refused at minimum were granted parole at the subsequent review. Overall yearly parole grants increased to 77% and this appears to have transpired due to beliefs that more parole grants might help alleviate prison overcrowdness which was thought the symptomatial cause of the CampHill riot. The underlying "client-centered" emphasis on rehabilitation however remained unchanged. The 1990 Board-authored, "Parole Decision Making Guidelines: a Statement of Policy, Procedure and Philosophy", stated that "an eligibility for parole expresses a philosophy of presumed release" unless a "preponderance" of information demonstrates that "the public safety interests of the community outweigh the liberty interests of the inmate."

Besides a less than 100% parole rate, another chief reason why no one could say for sure whether a parole application would be denied or granted under the pre-1996 Parole Act is the then-five Board Members (increased to nine in 1996) had an almost absolute discretion in parole making decisions. Though the Board was mandated to consider various statutory matters, within that lawful framework, its discretion can be guided by a Board

*Affidavit-Page Three*

Member's education, experience and general perspective which is apt to differ from Board Member to Board Member. In fact, in various post-1996 Declarations from, for instance, Board Member Martinez or Castor, the Board credited the sudden 1995-1996 plunge in parole grants to the new Board Members' perspective-directed paroling discretion. Yet, that discretion post-1996, remained relative to systemic changes in the Board's statutory mandate, philosophies and Pennsylvania's promises made good on in fulfilling Violent Offender Incarceration-Truth-In-Sentencing ("VOI-TIS") grant criteria. Therefore, because of the many variables involved in making a paroling decision, it's impossible to state with certainty how a Board Member might vote in any given case.

Between 1992 and 1994, parole philosophies, standards and real practices did not materially change from then-recent prior years. Overall yearly Parole Grants subsided a few percentiles each year, from 1991, 78.9% to 1994, 68.2% which was in keeping with a return to pre-1990 yearly parole rates. The state's prison population's potentiality for rioting was perceived as less of a threat than directly after the CampHill riot. Violent offenders made parole just as often as non-violent offenders and generally upon reaching the minimum sentence or upon subsequent review. From personal experience, at this timeframe, institutional support/recommendation for parole was very important as was a lack of recent serious misconduct reports involving assault or other criminal behavior. Although at this time, there were no mandated programming, it benefited the inmate to participate and complete what vocational, therapeutic and academic programming was available. Under prevailing paroling philosophies and practices, realizing these three factors were likely to clench a granting of parole. To get this general pre-1996 era of paroling customs in perspective, it's noted in footnote one below that inmates convicted of murder of the second and third degree, rapists and burglars were likely to make parole at the expiration of their minimum sentence. I attach hereto (Exhibit R) statistics from the Board from 19901991 that show the categories of offenders and numbers paroled and reparoled. If these same anatomized paroling statistics were available for each year to the present, then the question

---

1/ *Brandy v. PBPP*, 530 A.2d 507 (Pa.Cmwlth. 1987)(2nd degree murder, robbery, 10 to 20 years; paroled on minimum); *Brandley v. PBPP*, 587 A.2d 839 (Pa.Cmwlth. 1991)(3rd degree murder; paroled on minimum); *Shaw v. PBPP*, 671 A.2d 290 (Pa.Cmwlth. 1996)(paroled in 1992 on minimum for 2nd degree murder); *Scott v. PBPP*, 668 A.2d 590 (Pa.Cmwlth. 1995(paorled in 1993 on minimum for 3rd degree murder); *Lord v. PBPP*, 580 A.2d 463 (Pa.Cmwlth. 1990)( 9 to 21 years for rape, ISDI and escape; paroled on minimum); *Brown v. PBPP*, 668 A.2d 218 (Pa.Cmwlth. 1995(burglar paroled on minimum).

*Affidavit - Page Four*

of likelihood of paroling pre/post 1996 would be easily answered. However, after seeking via Right-To-Know Law Requests, the Board maintains that no similar statistics exist for years subsequent to 1991. For someone who never reviewed Pennsylvania's Applications for VOI-TIS grant funding, there may be no need to doubt the reasoning of the Board's assertion; yet, appended to litigant McCole's Amended Petition for Writ of Habeas Corpus are copies of Pennsylvania's VOI-TIS applications covering the years 1996 through 2001. Within those applications are paroling statistics provided by the Board to the Pennsylvania Commission on Crime and Delinquency (the agency that authored the six VOI-TIS applications) that clearly shows the Board was maintaining such statistics as how many violent offenders were making parole each year, the average percent of time spent in prison prior to paroling and the number of first time paroles for violent offenders.

Nonetheless, the question is would litigant McCole have likely made parole under the pre-1996 Parole Act? It is preliminarily fair to say that it is more likely that Mr. McCole would make parole under the pre-1996 Parole Act than the post-1996 Amended Parole Act. The systemic changes in philosophy, statutory mandate, policies and practices are unmistakable. The Board went from a client-centered philosophy with rehabilitation of the inmate at its heart to a philosophy of public safety with incapacitation and deterrence at its heart. In fiscal year 1995 to 1996, parole grants plunged to 53.3%, then dropped further in 1996 to 38.8%. In 1997 and 1998 parole grants were at 41% then for the next five years leveled to 50%: 1999: 48.3%, 2000, 49.8%, 2001, 52.5%, 2002, 50.9%. VOI-TIS application statements (as exhibited in Mr. McCole's Amendment to Habeas Corpus Petition) promised: parole at minimum under current policy was unlikely for violent offenders; the judge's sentence if thought too lenient would be a factor to deny parole; violent offenders, even those then already serving time, would be compelled to serve a greater percentage of their minimum sentence before paroling; and _inter_ _alia_, harsher judicial sentencing guidelines would also be given "heavy reliance" in parole-making determinations. At this juncture, the majority of parole grants went to non-violent offenders and technical parole violators. Parole grants for violent offenders were in 1996 immediately reduced by 50% than the year before.

Litigant McCole's 2002 parole application was denied; no explanation was provided except "the fair administration of justice cannot be achieved through your release on parole". This reasoning is obviously straight from the 1996 Parole Act Amendment 331.1. In reviewing McCole's 1999 parole denial based on "mandates to protect the safety of the public", here the Board was concerned with (1) successful completion of a treatment program for sex offenders; (2) favorable recommendation for parole from the DOC; (3) maintain a clear conduct record; (4)

*Affidavit - Page Five*

complete the DOC's prescriptive programs and (5) two statements that McCole's violent criminal history and conduct history in the DOC "causes concern". In 1999 the Board ordered that McCole not be reviewed again for parole until 2002. As the record and exhibits provided by McCole in his habeas corpus petition show, he satisifed the written, stated concerns of what the Board would review at the 2002 parole review. Still, parole was denied in 2002 based on language from the Amended Parole Act statute, 331.1. Under the totality of the facts surrounding the 2002 Parole Review, under the 1996 Parole Act it is likely that litigant McCole would have made parole. Litigant McCole's educational, therapeutic and vocational achievements coincide with a parole applicant's expressed desire to change and more telling, there was no finding that there was a preponderance of evidence to demonstrate the interests of the community outweighed the libery interest of applicant McCole. Even the Commonwealth Court's observation in <u>Loomis v. PBPP</u>, 878 A.2d 963 (2005) supports the likelihood of McCole's parole. The Commonwealth Court stated that one of the most important aspects in reviewing whether or not an individual would likely have been paroled prior to 1996 is to obviously look at the reasons why the individual was denied parole in the first place. Had there been factors countervailing a guideline parole recommendation, they would have appeared on the 2002 Notification of Board Decision (Habeas Exhibit 5). There were none. Even absent were the Board's 1999 stated concerns of "violent criminal history" and "DOC conduct history". Moreover, after directing that McCole serve another year before his next parole review, the Board stated it would consider at that time the same things stated considerable for the 2002 parole except this time the Board ordered a Sex Offender Assessment Board evaluation to be available at the time of the next review.

In 2003, litigant McCole was denied parole again (Habeas Exhibit 9) after the Board considered his parole application pursuant to the 1996 Amended Parole Act. New reasons for this parole denial were summed: (1) Reports, evaluations and assessments concerning your physical, mental and behavior condition and history; (2) your interview with the hearing examiner and/or Board member; (3) predatory nature of offenses; (4) high risk to re-offend. The Board ordered a five year set-back until its next parole review at which time it would consider the same things stated considerable in past parole denials with one exception (evaluations of your sex offense history and propensity to re-offend).

Initially, under the facts of this case, none of these reasons would have appeared in pre-1996 notification of parole denial. Number (1) is a post-1996 phenomenon which often causes people to become confused trying to decipher what the Board is referring to. Number (2) is likewise a post-1996 statement which again is not very illuminating. Numbers (3) and (4) were not legitimate pre-1996 reasons to deny parole. Litigant McCole was assessed by the Sex Offender Assessment Board and determined

*Affidavit - Page Six*

not to be a sexual predator. Moreover, under the Board's own pre-1996 Parole Decision Making Guidelines, sex offenses were provided a very low score for recidivism potential. This is because sex offenders have a low recivisim rate (*see* partial Recidivism of Sex Offender Report attached to Post-Answer Submission (Exhibit A)). Sex offenders have a 3.5% recidivism rate (new conviction for sex offense). Additionally, litigant McCole had by this time completed the state's most comprehensive sex offender programming and ongoing monthly sessions with a staff psychologist. Pre-1996, McCole would have been given the benefit of his rehabilitation accomplishments and not seen as someone not amendable to change after years worth of quality sex offender programming. Pre-1996 standards talk about "dignity and respect" for the "client"; nothing could be more contrary than successfully finishing years of sex offender programming and being denied parole on the basis of the original offense. Indeed, if such compelling reasons were extant to warrant a five-year set-back, why were these reasons not provided in the Board's 2002 Notification of Parole Denial that only warranted a one-year set-back? Pre-1996, the Board had a philosophy that it would require a preponderance of factors to show that public safety outweighed McCole's liberty interest to parole. No such statement was rendered as a reason to deny the 2003 parole application. Therefore, pre-1996, it is likely that undere the same set of facts, McCole would have again earned a grant of parole.

The Board has been chiefly concerned with McCole's sex offending behavior and assessment to determine whether he is a sexual predator. The assessment balanced in favor of McCole not being a sexual predator and he successfully accomplished the DOC's Sex Offender Program. Ordering a five-year set-back to review "your sex offense history" which will be the same then as it will be in five years and "propensity to re-offend" which is already so minimal that this area cannot be improved are simply not legitimate pre-1996 reasons to deny parole under the circumstances of this particular case.

Respectfully submitted,

*Steven Heiser*

I hereby states under the penalty of perjury that the forgoing is true and correct based upon my information, knowledge and belief.

11-13-05
_____
Date

*Steven Heiser*, AP 4426, SCI Somerset

This Exhibit is *True and Correct* and is based on information and statistics procured from the PA Department of Corrections and or The PA Board of Probation & Parole.

## Parole Board Statistics 1990-1991

| Violent Offenses | Parole | ReParole | Total | % Total |
|---|---|---|---|---|
| Homicides/Manslaughter | 370 | 91 | 461 | 6 |
| Assault | 586 | 89 | 675 | 8.8 |
| Robbery | 882 | 304 | 1,186 | 15.4 |
| Burglary | 903 | 274 | 1,177 | 15.3 |
| Arson | 75 | 19 | 94 | 1.2 |
| Rape | 224 | 64 | 288 | 3.7 |
| Other Sex Offenses | 159 | 20 | 179 | 2.3 |
| *Sub Totals* | 3199 | 861 | 4060 | 52.7 |

| Non Violent Offenses | Parole | ReParole | Total | % Total |
|---|---|---|---|---|
| Drug Law Violations | 1485 | 97 | 1,582 | 20.5 |
| Theft, RSP | 644 | 153 | 797 | 10.4 |
| Forgery and Fraud | 235 | 46 | 281 | 3.7 |
| Driving Under Influence | 300 | 16 | 316 | 4.1 |
| Other Type Offenses | 580 | 85 | 665 | 8.6 |
| *Sub Totals* | 3244 | 397 | 3641 | 47.3 |

In comparison to 2002 statistics that show only 24% of all yearly parole grants go to non-parole violator violent offenders, parole statistics from 1990,1991 reveal that over 75% of all yearly parole grants went to non-parole violator violent offenders.



## Exhibit R